**James Norman JOHNSTON, Plaintiff,**

v.

**The TOWN OF GREECE,
et al., Defendants.**

**James Norman JOHNSTON, Plaintiff,**

v.

**USA and Federal Bureau of
Investigation, Defendants.**

**Nos. 95–CV–6408L, 96–CV–6398L.**

United States District Court,
W.D. New York.

Nov. 12, 1997.

Robert L. Brenna, Brenna & Brenna, Rochester, NY, for Plaintiff.

Jane A. Conrad, Rochester, NY, for Defendants Town of Greece, Greece Police Dept., Gerard Ives, Norman Gerhart, Captain Gommell, William Mackin, G. Dipaola, Jr., Sergeant Sullivan. D. Murray.

Brian M. McCarthy, Asst. U.S. Atty., Rochester, for Defendants USA, Fed. Bureau of Investigation.

## DECISION AND ORDER

LARIMER, Chief Judge.

These civil actions arise out of plaintiff James Norman Johnston's ("Johnston") arrest and indictment on federal bank robbery charges in January 1994. The charges were dismissed approximately one year later, after Johnston had been detained for more than seven months.

Johnston first sued the Town of Greece, the Greece Police Department, and various individual employees of the Town pursuant to 42 U.S.C. § 1983, alleging that their participation in his arrest and detention violated his Constitutional rights. Johnston also asserted supplemental state claims of false arrest/imprisonment and malicious prosecution against these same defendants based upon a separate and unrelated arrest for assault, in March 1995.

Johnston later sued the United States and the Federal Bureau of Investigation (FBI), under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. (FTCA) for false arrest/imprisonment and malicious prosecution as the result of the federal bank robbery

charges. The two actions were consolidated pursuant to my Order dated February 6, 1997.

Defendants all have moved for summary judgment dismissing both actions in their entirety. Defendants assert that none of Johnston's claims can be sustained because probable cause existed for his arrest and prosecution on the federal bank robbery charges, as well as his assault charge. I agree and, therefore, for the reasons set forth below defendants' motion is granted and the complaints in both cases are dismissed.

## BACKGROUND

In November 1993 two banks located in the town of Greece, New York, were robbed: a Marine Midland bank on November 17, 1993 and a First National Bank on November 26, 1993. Each was robbed in the middle of the day by a lone, white male, who handed a note to the teller stating his intentions and demanding money.

Johnston was arrested on federal bank robbery charges (18 U.S.C. § 2113) on January 13, 1994. The robberies initially were investigated by both the Greece Police Department and the FBI, but Johnston was prosecuted on federal charges only. Johnston's arrest warrant was issued by United States Magistrate Judge Kenneth R. Fisher, and was based upon the supporting affidavit of FBI Agent James Quinn.

A federal grand jury was convened and heard evidence on February 15, 1994, and Johnston was indicted that same day and charged with the two bank robberies.

The indictment ultimately was dismissed by this Court on February 28, 1995, at the request of United States Attorney Bradley Tyler. Dismissal was sought pursuant to Fed.R.Crim.P. 48 and "in the interests of justice," because certain exculpatory evidence had come to light which convinced the Government not to press forward with the prosecution.[1]

---

1. Although the indictment was dismissed on February 28, 1995, the pre-trial detention order had been vacated and Johnston had been released from jail on his own recognizance six months earlier, on August 19, 1994. This release was, in part, orchestrated by the Government. The prosecutor had represented that he was prepared at that time to dismiss Count 2 of the indictment

In an unrelated matter, in March 1995, Johnston was arrested by members of the Greece Police Department and charged with second degree harassment as the result of an assault that occurred during an altercation between Johnston and his brother-in-law. Several days after the arrest, the charge was upgraded to third degree assault, allegedly because the brother-in-law's injuries were more serious than originally believed. Johnston moved to dismiss that charge for lack of probable cause, but Greece Town Justice David Michael Barry denied the motion, following a hearing, and ruled that there was probable cause for the arrest. Eventually Johnston pleaded guilty to the harassment charge in full satisfaction of the charges relating to that incident. In this action before me, Johnston claims that the state charges were augmented by Greece police officers in retaliation for Johnston's filing his notice of claim (of this lawsuit against them) the day before.

### DEFENDANTS' MOTION

All defendants move for summary judgment, asserting that the two actions should be dismissed in their entirety because Johnston cannot satisfy the criteria necessary to establish his claims. Specifically, defendants assert that probable cause existed for both arrests, thus defeating a necessary component of Johnston's claims for both false arrest/imprisonment and malicious prosecution.[2] Defendants also seek attorneys' fees and costs.

### Summary Judgment Standards:

Pursuant to Fed.R.Civ.P. 56(c), a moving party is entitled to judgment as a matter of law if there is "no genuine issue as to any material fact" and where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355. "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed. R.Civ.P. 56(e) (alteration in original)). Thus, summary judgment should be granted where the non-moving party's evidence is merely colorable, conclusory, speculative or not significantly probative. *Ferreira v. Westchester County,* 917 F.Supp. 209, 214 (S.D.N.Y.1996)(citing *Knight v. United States Fire Ins.,* 804 F.2d 9, 12–15 (2d Cir.1986)).

### Federal Bank Robbery Charges:

Johnston seeks money damages for his arrest and prosecution on the federal bank robbery charges. He bases his claims in part on information discovered well after his arrest and prosecution. Such an analysis is flawed, however. This case can only be analyzed in the proper context of what was known by the arresting officers at the time

relating to the First National Bank robbery. Because its case had been seriously weakened, the Government did not oppose the dramatic reduction of bail.

Further investigation, coupled with an exculpatory handwriting analysis from the FBI Laboratory of the notes used in the robbery, eventually led to dismissal of all charges on February 28, 1995. The reasons and the timing for the dismissal are set forth in the prosecutor's letter to the Court, dated February 24, 1995, (Exhibit 13 to the Declaration of Jane A. Conrad, dated April 25, 1997), and are discussed to some extent at the Court's hearing on February 28, 1995, when the Government's Rule 48 motion for dismissal was granted.

**2.** Johnston's claims against the Town of Greece defendants, brought pursuant to 42 U.S.C. § 1983, are styled as false arrest/imprisonment and malicious prosecution claims. While a common law tort is not cognizable under Section 1983 unless it also violates the federal Constitution or statutory law, Johnston's false arrest/imprisonment and malicious prosecution claims support causes of action under Section 1983 because they involve alleged violations of the Fourth Amendment. *See Lennon v. Miller,* 66 F.3d 416, 423, 425 (2d Cir.1995); *Cook v. Sheldon,* 41 F.3d 73, 77, 79 (2d Cir.1994).

the events occurred. Viewed in that context, Johnston's claims have no merit and must be dismissed.

■ State law applies to Johnston's FTCA claims as well as his state tort claims brought pursuant to 42 U.S.C. § 1983. *See Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)("State law applies to an FTCA claim"); *Cook v. Sheldon,* 41 F.3d 73 (2d Cir.1994)(where court applied state law elements of malicious prosecution tort to § 1983 claim). In New York, the elements of a false arrest/imprisonment claim are that (1) the defendant intended to confine the plaintiff (2) the plaintiff was conscious of the confinement (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.[3] *Bernard,* 25 F.3d at 102. A finding of probable cause is a complete defense to an action for false arrest. *Id.* (citing *Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42,45 (2d Cir.1985)).

■ The elements of a malicious prosecution claim are (1) the commencement of a criminal proceeding (2) which is ended or terminated in the plaintiff's favor (3) where there was no probable cause to believe that the plaintiff was guilty of the crime charged and (4) the defendants acted with actual malice. *Cook,* 41 F.3d at 79.

Thus, the existence of probable cause at the time of Johnston's arrest and prosecution is a complete defense to both claims. Because I believe that probable cause clearly existed when Johnston was arrested, his current claims fail.

■ Probable cause has been defined as the "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975) (citations omitted). Stated differently, probable cause exists where the arresting party possesses knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the

manner complained of. *See Rounseville v. Zahl,* 13 F.3d 625, 629 (2d Cir.1994). "Although an arrest cannot be based on a mere hunch … 'a probable cause determination does not require proof beyond a reasonable doubt, it is the mere probability of criminal activity, based on the totality of circumstances, that satisfies the Fourth Amendment.'" *Dale v. Kelley,* 908 F.Supp. 125, 133 (W.D.N.Y.1995) (citations omitted), *aff'd,* 95 F.3d 2 (2d Cir.1996). Indeed, the eventual disposition of the criminal charges is irrelevant to the probable cause determination.

■ In this case, Johnston was arrested based on a warrant issued by Magistrate Judge Fisher. Agent Quinn and other members of the investigating departments did not arrest Johnston without a warrant (as they might have done), but rather they presented their evidence supporting probable cause to Magistrate Judge Fisher. Normally, the issuance of a warrant by a neutral magistrate creates a presumption of probable cause. *Golino v. City of New Haven,* 950 F.2d 864 (2d Cir.1991). The officers are entitled to rely on the issuing judge's decision that probable cause exists and the officers are shielded from any liability relating to the arrest if they relied on the judge's decision in good faith. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677(1984).

■ This presumption concerning issuance of the warrant can be overcome only by a substantial preliminary showing that the officer seeking the warrant "'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.'" *Soares v. Connecticut,* 8 F.3d 917, 920 (2d Cir.1993)(citing *Golino,* 950 F.2d at 870–71); *see Franks v. Delaware,* 438 U.S. 154, 155–156, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978); *Simms v. Village of Albion,* 115 F.3d 1098 (2d Cir.1997).

■ Similarly, a grand jury indictment also creates a presumption of probable cause

---

3. False arrest and false imprisonment are synonymous under New York law. *Posr v. Doherty,*

944 F.2d 91, 96 (2d Cir.1991).

that can be overcome only by a showing that the indictment was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Bernard*, 25 F.3d at 104 (citing *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)).

The information contained in Agent Quinn's affidavit and the evidence presented to the grand jury were exceptionally strong and provided more than ample basis for the Magistrate Judge to issue the warrant and for the grand jury to return the indictment.

 In his affidavit, Quinn stated that Johnston's mother Mildred positively had identified Johnston, as her son, from a bank surveillance photograph taken during one of the robberies. Indeed, Mildred provided a written statement.[4] Similarly, Johnston's brother David also positively identified Johnston, as his brother, from the same surveillance photograph. Quinn also stated that two parole officers who knew Johnston—Harry Long and Mearle Heath—noted a resemblance between Johnston and the person depicted in the surveillance photograph. Finally, Quinn stated that Linda Wolpert, one of the victim tellers, had positively identified Johnston as the robber from a six-photo array. Based upon these representations, Magistrate Judge Fisher issued a warrant for Johnston's arrest.

 These same witnesses and others testified before the grand jury one month later. Wolpert's grand jury testimony was consistent with Quinn's representation, as was both Mildred and David Johnston's. Indeed, the Johnstons' testimony was even stronger than Quinn's earlier representation. Mildred Johnston's grand jury testimony, in relevant part, was as follows:

Q: When you saw this photograph back on January 11, 1994, did you recognize the person depicted in the photograph?

A: Just about right away.

Q: Okay. How were you able to tell?

A: I know my son.

Q: And is that James Norman Johnston?

A: I would almost swear to it.

Q: Okay . . . And that's what you told the agents and the officers . . . on January 11, 1994?

A: Yes, I did. I have always told my kids I would never lie for them.

\* \* \* \* \* \*

Q: (by grand juror) what part of the picture made you certain that that was your son?

A: The face and the build. Even the fingers. And if you look real hard, there is a scar, which he did. He cut himself all up once.

United States Grand Jury, testimony of Mildred Johnston, February 15, 1994, at pp. 8–9, 11.

David Johnston's grand jury testimony was as follows:

Q: [O]n the occasion [in January 1994] of the agents and officers being at your mother's house they showed you a single black-and-white photograph.

A: Yes, they did.

Q. And did you recognize the person in the photograph?

A. Yes, I did.

Q. And who did you see in the photo?

A. My brother.

Q. James Norman Johnston, Jr.?

A. Yes.

\* \* \* \* \* \*

Q. However, you did not sign anything that day, did you? You told the agents you didn't want to sign anything?

A. Right.

Q. Okay. Any questions from the grand jury? Yes, ma'am.

---

4. Quinn's affidavit reads as follows:

"On January 11, 1994, Mildred M. Johnston, mother of James N. Johnston, viewed a bank surveillance photograph taken during [one of the robberies] . . . . and positively identified the individual depicted in the photograph as being her son, James Johnston. Mildred M. John-

ston advised that it was definitely him and noted the scar on James Johnston's left cheek. Mildred M. Johnston provided a signed· statement regarding this information." Affidavit of James P. Quinn (sworn to January 12, 1994) at ¶ 7.

GRAND JUROR: Why didn't you want to sign?

A. Well, I wasn't sure at the moment. I needed time to think it over, and he is my brother, so I wasn't sure.

GRAND JUROR: When were you sure?

A. Well, actually, I noticed the scar on his face. That's when I knew it was my brother. But I still didn't sign.

Q. Are you afraid of your brother?

A. I don't know how to put it.

Q. Are you afraid of your brother?

A. No, I am not.

Q. Were you unsure whether you should sign anything because you didn't know what was really going on with the agents and the officers when they came to the house?

A. Right. Exactly. Then, when I got the subpoena, I figure I should. It is the only right thing to do.

GRAND JUROR: So your feeling now is what, that it is, that you believe it is or you still are not sure?

A. Oh, it is. I believe so. I wasn't sure at the time, but now I'm sure.

United States Grand Jury, testimony of David Johnston, February 15, 1994, at pp. 5–7.

In this case, the identification of the bank robber was obviously the crucial matter in dispute. It is hard to imagine a more positive identification than the one put forward by Johnston's own mother and brother to Agent Quinn and the grand jury. This evidence was not submitted by a person unknown to Johnston, but by his own mother and brother.

Johnston asserts that probable cause for his robbery arrest did not exist because Agent Quinn made material misrepresentations and failed to present significant exculpatory evidence to Magistrate Judge Fisher, and that comparable misrepresentations and omissions were made to the grand jury.

Specifically, Johnston now asserts that Quinn misrepresented the statements made by Mearle Heath, David Johnston, and Mildred Johnston. However, the facts do not support Johnston's assertions. Conclusory

allegations and speculation cannot defeat summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

Both Mildred Johnston and David Johnston corroborated Quinn's affidavit before the Magistrate Judge by presenting positive and dramatic testimony before the grand jury identifying Johnston as the bank robber depicted in the bank surveillance photograph. This testimony could not have been stronger. It is hard to imagine the grand jury not finding probable cause based on that testimony alone.

The Johnstons have now had a remarkable change of heart and attempt to recant their earlier statements. However, the record stands concerning what occurred at the time of Johnston's arrest and indictment. The Johnstons' feeble attempts now to reconstruct history must be given little weight here.

Mildred Johnston asserts now that at the time of her original identification, her vision was "impaired" due to medication she was taking and that she was never shown the demand notes or the composite drawings which she believes somehow would have convinced her not to identify her son. She denies ever mentioning a scar, although her grand jury testimony clearly reflects that testimony as does her prior written statement. She claims that she was intimidated and misled by the investigating agents, although her allegations in this regard are hardly compelling. (Ex. 9 to the Declaration of Robert L. Brenna, Jr., dated June 13, 1997).

Similarly, Johnston's brother, David, claims that had he been aware of other evidence, he would not have positively identified his brother from the surveillance photograph. I fail to understand the logic of that assertion. It is not a very difficult task for family members to identify their son or brother, and other information would have little bearing on their ability to perceive what was shown in the surveillance photograph. For example, it makes little sense for David Johnston to claim that he could have made a better identification had he seen composite drawings when he based his identification on a

live photograph of the robber committing the robbery.

■ It is clear that the testimony now presented by the Johnstons is dramatically different from what they presented to the grand jury under oath and the change now is not relevant to the question of whether probable cause existed at the time of Johnston's arrest and indictment. In short, all the evidence at that time indicated, very strongly, that both Johnston's mother and his brother positively identified him from the surveillance photograph as being the bank robber.

Only Heath's grand jury testimony arguably was inconsistent with Quinn's affidavit. He stated to the grand jury that he was not sure if the person depicted in the photograph was Johnston, and he said he "didn't think it was him." United States Grand Jury, testimony of Mearle Heath, February 15, 1994, p. 7. While there appears to be some discrepancy between Heath's opinion as represented by Quinn versus Heath's later grand jury testimony, there is no evidence or indication that Quinn deliberately misrepresented Heath's comments in the affidavit submitted to Magistrate Judge Fisher. Johnston relies entirely on his own conclusion that Quinn lied, but it may simply have been an instance where Heath's testimony at the grand jury was different from what he initially reported to Agent Quinn. In any event, Quinn's representations before the Magistrate Judge concerning Heath were quite modest. Quinn merely represented that Heath and Long, parole officers who knew Johnston, noted a resemblance between Johnston and the person in the surveillance photograph. The Magistrate Judge was never advised that these men made a positive identification.

Johnston also asserts that neither Magistrate Judge Fisher nor the grand jury was provided with exonerating information which he believes to be important, i.e., certain composite drawings, handwriting examples, and fingerprint analyses. Apparently, a composite was prepared immediately after the November 17, 1993 Marine Midland robbery, with the assistance of the victim teller Linda Wolpert. The creator of the composite was Norman M. Gerhard, II, an officer with the Greece Police. Gerhard asserts that Ms.

Wolpert was inattentive and tired during the composite interview and because of this he was concerned that the composite would not be accurate. He relayed his concerns to his superior officer, who advised him to discontinue work on it. Thus, the composite was set aside and never shown to anyone or discussed until January 1995, one year after Johnston's arrest.

Johnston also alludes to a second composite that was created after the second robbery. The record reveals little about this alleged composite. It appears that even the FBI was unaware of either composite until January 1995.

Additionally, Johnston notes that three other witnesses were unable to identify Johnston from photo arrays. One Deanne Osborne, a witness to the Marine Midland robbery, was shown a photo array on January 10, 1994. She was unable to make any identification. Another witness to the Marine Midland robbery, Laura Shaw, selected Johnston's photo, along with two others from a six photo array, and concluded "I don't know." This information was not provided to Magistrate Judge Fisher and these witnesses were not called to testify before the grand jury.

Finally, the victim teller from the First National Bank, Michelle Thorne de Pinales, was unable to make a positive identification of Johnston from the photo array. She testified to this before the grand jury but this information was not given to Magistrate Judge Fisher.

Thus, asserts Johnston, the Magistrate Judge and the grand jurors were unaware of important exculpatory information, making the warrant and the indictment invalid. Johnston asserts that because this exculpatory evidence might cause reasonable persons to draw different inferences regarding the existence of probable cause, this Court should not make a probable cause determination: such a determination should be made by a jury. *See Rounseville*, 13 F.3d at 630 ("the issue of probable cause is a question of law to be decided by the court only where there is no real dispute as to the facts or the

proper inferences to be drawn from such facts").

I disagree. As noted, Johnston can overcome the presumption that probable cause existed for his arrest only by showing that Agent Quinn " 'knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit' or omitted material information [to Magistrate Judge Fisher], and that such false or omitted information was 'necessary to the finding of probable cause.' " *Soares,* 8 F.3d at 920 (citing *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676–77); *see also United States v. Rivera,* 750 F.Supp. 614, 618 (S.D.N.Y. 1990)(when determining whether the Constitution was violated during application for a warrant, the "affidavit must be examined to see if material information was omitted deliberately or with reckless disregard for the truth and if with the inclusion of the omissions probable cause still existed."). This Johnston has failed to do. First, there is no evidence before me that Agent Quinn made any omissions "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir.1990)(citing *United States v. Reivich,* 793 F.2d 957, 961 (8th Cir.1986)). The Fourth Amendment protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate. *Reivich,* 793 F.2d at 961. Mere negligence in recording the facts relevant to a probable cause determination is not enough. *Franks,* 438 U.S. at 170, 98 S.Ct. at 2684.

Moreover, I find that the omissions were immaterial. Thus, even if the omitted information had been provided to the Magistrate Judge, I find that it would have made no difference to his probable cause finding. *See Soares,* 8 F.3d at 920 (when determining whether false or omitted information would have made any difference in a finding of probable cause, "a court should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause.... If probable cause remains, no

constitutional violation ... has occurred"). As discussed below, in this case the identification evidence was so compelling that even with the additional exculpatory information there could be no reasonable debate regarding the existence of probable cause. Accordingly, no constitutional violation occurred as the result of Quinn's alleged omissions.

The undisputed facts contained in Agent Quinn's supporting affidavit before the Magistrate Judge were overwhelmingly strong. Rare indeed is the occasion when a suspect's own mother positively identifies him, on two separate occasions over a period of several weeks, noting that she "would never lie" for her kids. The identification evidence of Johnston's mother and brother are very strong and could not be much more reliable. Thus, the inability of three eye witnesses to identify Johnston from a photo array simply does not rise to the level of creating a question of fact on the issue of probable cause.

As for the composite drawings, despite Johnston's strenuous assertions about the significance of the composite drawings, I find that they are of little worth. The whole matter concerning these composite drawings is irrelevant to the issue at hand. There was no need for any composite drawing when the victim teller, Ms. Wolpert, made a positive identification from an actual photograph of the robber. It is hard to imagine why a composite would be used when a victim positively identified the robber from a photograph. In light of the teller's identification and the positive identification made by Johnston's mother and brother, it is quite understandable and reasonable for the investigating officers to abandon their use of a composite drawing as an investigative technique. Thus, I find that the omission of the composites was neither improper nor material.

This case is unlike *Golino, supra,* on which plaintiff relies. In that case, the plaintiff was arrested on murder charges which were dismissed just prior to trial, after a blood test revealed that the killer's blood type did not match the plaintiff's. The court determined that significant information had been omitted from a warrant application, and whether this omission made a difference to the arresting

officer's belief that probable cause existed was not appropriate for determination on summary judgment. In that case, the affiant had failed to inform the magistrate of several witnesses whose descriptions of the killer were altogether inconsistent with the plaintiff's physical characteristics. Additionally, the affiant failed to inform the magistrate that the killer's blood type was identifiable but no blood test of the plaintiff had been ordered. Ultimately it was the blood test that proved the plaintiff could not have been the murderer. Finally, one of the strongest pieces of information contained in the affidavit was a representation made by the plaintiff's ex-wife, with whom he was engaged in a nasty custody battle and who had conceded that she would do anything to ensure that he never saw his children again.

These factors individually and together are significantly more compelling than any so-called exculpatory evidence cited by Johnston in this case. Thus, I find that any omission by Agent Quinn was insignificant. *See Simms*, 115 F.3d at 1107 (to overcome the presumption of good faith "omitted information must be shown to be material and necessary to a finding of probable cause."); *Colkley*, 899 F.2d at 301 (same). There can be no reasonable doubt that probable cause existed

to arrest Johnston on federal robbery charges.[5]

As for the grand jury, I find no evidence whatsoever that the indictment was procured by fraud, perjury or other bad faith. The grand jurors heard the same evidence (and more) that was presented to Magistrate Judge Fisher. Indeed, Mildred and David Johnston's testimony before the grand jury was even stronger than as represented by Quinn, weakening Mildred's claim of intimidation during the original identification interview since the grand jury testimony came weeks thereafter. In short, there simply is no evidence of any fraud in the grand jury proceedings.

■ Moreover, the Government's failure to present exonerating evidence before the grand jury does not advance Johnston's case because the Government had "no obligation to present exculpatory material to a grand jury." *United States v. Regan*, 103 F.3d 1072, 1081 (2d Cir.1997)(citing *United United States v. Williams*, 504 U.S. 36, 51–52, 112 S.Ct. 1735, 1744–45, 118 L.Ed.2d 352 (1992)). Thus, there is no evidence that the grand jury indictment was unlawful or invalid in any way.[6]

**5.** In *Colkley, supra,* the United States Court of Appeals for the Fourth Circuit questioned whether an investigating agent has any obligation to include all potentially exculpatory evidence in an affidavit supporting a warrant application. It concluded that "a rule requiring affiants to disclose all potentially exculpatory information has nothing to recommend it." 899 F.2d at 303. The *Colkley* Court found that requiring an affiant to present all exculpatory evidence would be wrong for several reasons. First, it improperly would import the rule stated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (requiring the prosecutor to disclose exculpatory evidence) from the trial context, where guilt or innocence ultimately is determined, into the warrant application process, where no such determination is made. Second, it would intermix the elements considered under *Brady*, where the intent of the prosecutor is irrelevant, with the elements set forth in *Franks v. Delaware, supra,* where the investigator must be found to have acted with deliberate intent to mislead. Finally, it "would severely disrupt the warrant process ... plac[ing] an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile

attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded." *Id.* at 303. Accordingly, the Fourth Circuit determined that "[u]nless the [arrestee] makes a strong preliminary showing that the affiant excluded critical information from the affidavit with the intent to mislead the magistrate, the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity." *Id; see also United States v. Shields*, 783 F.Supp. 1058, 1075–76 (N.D.Ill.1991)(finding persuasive the *Colkley* court's reasons for rejecting the argument that the Fourth Amendment imposes a duty upon the government to disclose potentially exculpatory evidence when applying for a warrant).

**6.** Johnston also claims that exonerating handwriting and fingerprint evidence was omitted from presentation to both the Magistrate Judge and the grand jury. However, the record suggests that this evidence (which appears incomplete and/or inconclusive) did not exist until March and August 1994, respectively, well after both the arrest and indictment. Thus, its existence (whether conclusive or not) is irrelevant to the claims before me.

I find that Johnston has failed to overcome the presumption that probable cause existed for his arrest and indictment on federal bank robbery charges. Because probable cause existed, Johnston's malicious prosecution and false arrest/imprisonment claims against all defendants arising out of these charges are dismissed.[7]

**State Harassment Charge:**

The Greece defendants argue that because Johnston pleaded guilty to the state harassment charges, he has admitted that probable cause existed for his arrest and thus is collaterally estopped from raising Section 1983 claims arising from the same arrest. I agree. It is well established that "where the civil rights plaintiff has been convicted of the offense for which he was arrested, we have in effect accepted the fact of that conviction as conclusive evidence of the good faith and reasonableness of the officer's belief in the lawfulness of the arrest." *Cameron v. Fogarty*, 806 F.2d 380, 388 (2d Cir.1986). In this case, Johnston pleaded guilty at a hearing and he had this colloquy with the Court:

THE COURT: For the record, you are James N. Johnston, Junior?

THE DEFENDANT: Yes.

THE COURT: Have you had an opportunity to discuss this matter with your attorney ... ?

THE DEFENDANT: I have.

THE COURT: Are you satisfied with his representation in this matter?

THE DEFENDANT: Yes.

THE COURT: Do you understand that this matter was scheduled for trial purposes and you had a right to go ahead with the trial if you so chose to?

THE DEFENDANT: Yes.

THE COURT: You would have a right to confront any witnesses that may have been brought on by the People against you?

THE DEFENDANT: Yes.

THE COURT: That this plea is the same as a conviction after trial?

THE DEFENDANT: I understand.

THE COURT: Have any promises been made to you or have any threats been made to you to induce you to make this plea?

THE DEFENDANT: None.

THE COURT: ... How do you plead to the amended charge of harassment in the 2nd degree a violation of Section 240.26 subdivision 3 of the Penal Law, ... ? How do you plead to that charge?

THE DEFENDANT: Guilty.

Transcript of Proceedings before Honorable David Michael Barry, Town Court Justice, Greece Town Court, June 25, 1996, at pp. 7–8.

■ I find that this plea collaterally estops Johnston from denying the existence of probable cause for his arrest. *See Ferreira*, 917 F.Supp. at 218 (where the plaintiff in a Section 1983 action "plead guilty to a charge filed in connection with the underlying set of events, [he was] collaterally estopped from denying the existence of probable cause for his arrest").

■ Moreover, because the validity of his guilty plea has never been challenged or modified in any way, I find that Johnston is barred pursuant to *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), from bringing a Section 1983 claim for damages. *See Heck*, 512 U.S. at 487, 114 S.Ct. at 2372 (in an action for damages brought pursuant to 42 U.S.C. § 1983, where a judgment in favor of the plaintiff would necessarily imply the invalidity of his convic-

**7.** Once Johnston was indicted, responsibility for his prosecution shifted from the FBI to the United States Attorney's Office. Johnston's claims cannot be asserted against the federal prosecutors for two compelling reasons. "Prosecutors are entitled to absolute immunity from suits for damages arising from activities that are 'intimately associated with the judicial phase of the criminal process.'" *Barbera v. Smith*, 836 F.2d 96, 99 (2d Cir.1987)(citing *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). Moreover, the FTCA does not authorize claims against federal prosecutors. *Bernard*, 25 F.3d at 104–105 (citing *Dirienzo v. United States*, 690 F.Supp. 1149, 1158, n. 8 (D.Conn. 1988)("The United States Attorney and his assistants are not 'law enforcement agents' for whose intentional torts the government is liable under [the FTCA].")).

tion or sentence, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.); *Duamutef v. Morris,* 956 F.Supp. 1112 (S.D.N.Y.1997)(dismissing plaintiff's Section 1983 claim for malicious prosecution and false arrest because the underlying murder conviction had not been reversed or otherwise invalidated). Thus, Johnston's malicious prosecution and false arrest claims brought pursuant to 42 U.S.C. § 1983, arising out of the state harassment charge, are dismissed.[8]

Finally, because Johnston's federal claims are dismissed in their entirety, I hereby dismiss all of his supplemental state claims as well. *See* 28 U.S.C. § 1367(c)(3).

### CONCLUSION

For all the above reasons, I hereby GRANT defendants' joint motion for summary judgment (# 37) and dismiss Johnston's claims against all defendants in these consolidated actions in their entirety, with prejudice. However, because I find no evidence that Johnston pursued this action without any credible or legitimate basis, I DENY defendants' request for fees and costs.

IT IS SO ORDERED.

---

8. To the extent Johnston claims the arrest was an act of retaliation for asserting his First Amendment rights, such claim too is barred because a retaliation claim cannot be sustained when the criminal prosecution was supported by probable cause. *Duamutef,* 956 F.Supp. at 1116; *see also Mozzochi v. Borden,* 959 F.2d 1174, 1180 (2d Cir.1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government.");

*Singer v. Fulton County Sheriff,* 63 F.3d 110, 120 (2d Cir.1995)(upholding dismissal of First Amendment retaliation claim: "if the officer ... had probable cause ... then we will not examine the officer's underlying motive in arresting and charging the plaintiff"), *cert. denied,* — U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996). Because Johnston is collaterally estopped from denying the existence of probable cause, I find that he is also barred from pursuing his retaliation claim.